**Ernest G. CAMPBELL, Jr., et al.**

v.

**A. L. BENDER, Mayor, et al.**

Court of Appeals of Tennessee, Eastern Section.

Nov. 23, 1973.

Certiorari Denied by Supreme Court June 3, 1974.

DiRisio & Reingold, Chattanooga, for appellants.

Eugene N. Collins, Gary D. Lander, Chattanooga, for appellees.

OPINION

SANDERS, Judge.

The Plaintiffs have appealed from a decree of the Chancery Court of Hamilton County dismissing their suit seeking a judgment against the City of Chattanooga in behalf of the Firemen's and Policemen's Insurance and Pension Fund.

The Complainants, Ernest G. Campbell, Jr., William D. Brock, Leon Wilkey, Jerry

Evans, George Spencer and Harry E. Schroyer, Jr., as directors of the Firemen's and Policemen's Insurance and Pension Fund for the City of Chattanooga, filed suit in the Chancery Court of Hamilton County against the Defendants, A. L. Bender, Mayor, Steve F. Conrad, Charles A. Rose, James B. Turner, and S. Dean Petersen, Board of Commissioners of the City of Chattanooga.

The Complainants allege that, pursuant to the Private Acts of 1949, Chapter 165, as amended, a pension fund for certain employees of the City of Chattanooga was created, known as the Firemen's and Policemen's Insurance and Pension Fund; that the Act provides that the City will pay into said fund a sum equal to 9% of the total monthly payroll of the Department of Firemen and Policemen; that the City failed to pay the amount required by the Act and the City is indebted to the fund for the difference in the amount actually paid and the amount it should have paid.

The City insists that the Act, as amended, did not require it to pay 9% of the total payroll of the Fire and Police Department into the fund, but it was only required to pay 9% of the payroll of the employees in the Department who participated in the pension plan.

The case was tried before The Honorable Ray L. Brock, Jr., Chancellor, and the Chancellor found the issues in favor of the City.

The Complainants have appealed to this court and assigned error. The assignments of error are:

"1. The Court erred in holding that Chapter 165 of the Private Acts of 1949, as amended, did not require the City to pay, into the Pension Fund, an amount equal to 9% of the payroll of the Department of Fire and Police.

"2. The Court erred in holding that the City, in determining its 9% payment, could deduct from the Department payroll the salaries of those employees who were not participants in the Pension Fund."

The portions of the 1949 Act, as here pertinent, are as follows:

"Sec. 2. *Be it further enacted,* That the Board of Commissioners of said City, after it has adopted a budget for the salaries of the Department of Fire and Police each year, shall add nine per cent of the amount of the budget adopted for salaries of said Department, which sum so added shall be placed in the Firemen's and Policemen's Insurance and Pension Fund. In event there are special appropriations for salaries for Fire and Police Department over and above the general budget so fixed, then said Board of Commissioners shall add nine per cent to the amount of said appropriations for salaries and said sum shall be paid into the Firemen's and Policemen's Insurance and Pension Fund.

. . .

\* \* \* \* \* \*

"Sec. 4. *Be it further enacted,* That each and every employee of the Department of Fire and Police shall be assessed five per cent of his or her salary for the benefit of the Firemen's and Policemen's Insurance and Pension Fund. . . .

"Sec. 7. *Be it further enacted,* That a sum equal to nine per cent (9%) of the monthly pay roll of the Department of Fire and Police shall be collected by the Tax Collector and Treasurer and paid over to said Trustee each month when the five per cent (5%) contribution by the employees is deducted from the pay roll."

The proof shows that, at the time the Act was passed, all of the employees in the Department, except perhaps two clerks, were regular, uniformed firemen and policemen and all employees participated in the plan. As the Department grew, more and more clerical employees were employed by the Department and the trustees of the pension plan would not permit the new

clerical employees to participate in the plan, restricting the participants to regular policemen and firemen. The record is not clear when this practice first started, but the record does show that as early as 1954 there were four employees who were not participating in the pension plan.

The proof further shows that as new employees were excluded from the plan, the practice of not assessing the excluded employees 5% of their salary, as provided in Section 4, and the City's contributing 9% of the salaries of the participating employees instead of 9% of the total salaries, as provided in Sections 2 and 7, also developed.

In 1961 Chapter 222 of the Private Acts amended Section 4 of the 1949 Act so as to require only those employees participating in the plan to contribute 5% of their salary to the fund.

Sections 2 and 7 of the 1949 Act were not affected by the 1961 amendment and remained intact until 1969 when Chapter 82 of the Private Acts amended Section 7 of the 1949 Act to require the City to contribute 9% of the salaries of the participants in the plan instead of 9% of the total salaries of the Department.

The only question before us for determination is whether the City was required, prior to 1969, to pay into the pension fund 9% of the total payroll of the Department of Firemen and Policemen or only 9% of the salaries of those employees in the Department who were participating in the pension plan.

◼ We think the language of the 1949 Act is perfectly clear that the City was to pay 9% of the total payroll of the Department into the pension fund.

The City insists that the Act is ambiguous since Section 2 of the Act provides that the City "shall add nine per cent of the amount of the budget adopted for salaries of said Department, which sum so added shall be placed in the . . . Fund," and Section 7 provides that "a sum

equal to nine per cent (9%) of the monthly pay roll of the Department . . . shall be collected by the Tax Collector and Treasurer and paid over . . . ."

◼ While it is true there is some discrepancy in the provisions of the two sections as to when and how the payments are to be made, there is no discrepancy as to the amount which is to be paid. The language of the Act is so clear as to the amount the City is required to pay into the fund that there is no need for interpretation.

As early as 1840, in the case of Miller v. Childress, 21 Tenn. (2 Humphreys) 320 at 321, 322, the court said:

"Where a statute is plain and explicit in its meaning, and its enactment within the legislative competency, the duty of the courts is simple and obvious, namely, to say *sic lex scripta,* and obey it."

This is still the rule in this state today.

In the case of Anderson v. Outland, 210 Tenn. 526, 532, 360 S.W.2d 44, 47, the court said:

"The whole purpose of statutory interpretation is to ascertain and give effect to the legislative intent; and all rules of construction are but aids to this end. Woodroof v. City of Nashville, 183 Tenn. 483, 489, 192 S.W.2d 1013. Where the words of a statute are clear and plain and fully express the legislative intent, there is no room to resort to auxiliary rules of construction. State ex rel. Weldon v. Thomason, 142 Tenn. 527, 539, 221 S.W. 491; Gilmore v. Continental Casualty Co., 188 Tenn. 588, 591, 221 S.W.2d 814. In Hickman v. Wright, 141 Tenn. 412, 418, 210 S.W. 447, 448, it was said:

" 'The universal rule seems to be that if the actual language and provisions of the statute are plain and clear, and are devoid of contradiction or any affirmative ambiguity, so that the statute, as the result of the express provisions, is not reasonably susceptible of a twofold

meaning, then there is no room for applying any other rules or canon of construction to the act.' (Citing numerous authorities.)"

"Since unambiguous statutes must be construed to mean what they say, there is no room for argument here." Montgomery v. Hoskins, 222 Tenn. 45, 47, 432 S.W.2d 654, 655.

█ The Defendant argues that the action of the legislature in amending the Act of 1949 by the Act of 1961 and again in 1969, shows what the intent of the legislature was in 1949.

We cannot agree. It has been held in numerous jurisdictions ". . . that the construction of a statute cannot be aided by the legislative history of another act passed several years after the enactment of the statute in question. . . ." 82 C.J. S. Statutes § 366, page 810.

█ The Defendant also argues that, since there are a number of employees in the Department of Fire and Police who are not covered by the pension plan but who are participating in a general pension plan for the City employees and the City is paying nine per cent of their salary to the general pension fund, it would be inequitable to require the city to pay nine per cent of their salary into two pension funds.

This argument seems to have been persuasive with the Chancellor in his decision of the case. The Chancellor, in his memorandum opinion, said: " . . . the Court is satisfied that the City should not be required to pay into said fund an amount equal to 9% of any employee of said departments unless said employee was a participant of said Insurance and Pension Fund. Any other construction would result in the City's paying twice for the pensions of those employees of the Fire and Police Departments who were not participants in the Insurance and Pension Fund of the Fire and Police Department, but were participants in the Salaried Employees Pension System of the City; and it

is clear to the Court that such a result was never intended by the Legislature."

The proof shows that at the time of the passage of the 1949 Act no other pension plan was in effect for city employees. The pension plan for the other city employees did not come into being until 1965. Any provision in the 1965 Act requiring the City to contribute 9% of the salaries of employees covered by that Act could not be looked to for determining the intent of the legislature in 1949.

We think the language of the court in the case of Scheibler v. Mundinger, 86 Tenn. (2 Pickle) 674, at page 693, 9 S.W. 33 at page 39, applies here, where the court said:

"Moreover, the court, under the guise of a liberal construction, cannot so minimize the plain provisions of a statute as to practically destroy their efficient operation, and so say that the legislature did not intend that its command should be obeyed; and for a stronger reason this is true when the requirement is that a particular thing be done, and when this requirement is a new graft upon an old system, and one of the most strongly marked of all the new features introduced. It is the duty of the court to enforce this law as it is found upon the statute book; and, if it be a good law, its beneficent results will more clearly appear; if it be a bad one, its character will be the sooner manifest, and relief can be craved of that body whose duty it is to make new laws and to mend old ones."

The assignments of error are sustained.

The judgment of the Trial Court is reversed and the case is remanded generally and specifically for the purpose of entering a decree in keeping with this opinion.

The cost of this appeal, together with the cost of the Trial Court, is taxed to the Appellee.

PARROTT, J., and LUKE M. McAMIS, Special Judge, concur.